**SOUTHERN FEDERAL POWER CUSTOMERS, INC.,**
Plaintiff,

v.

**Luis CALDERA, Secretary of the U.S. Department of the Army, et al.,**
Defendants.

No. 00–2975 (TPJ).

United States District Court,
District of Columbia.

Feb. 10, 2004.

David Acton Fitzgerald, Edward Joseph McGrath, Joan Cathy Fogel, Orlando E. Vidal, Clinton A. Vince, Sullivan & Worcester, LLP, Washington, DC, for Plaintiff.

Kenneth Leonard Wainstein, Mark E. Nagle, U.S. Attorney's Office, Ruth Ann Storey, U.S. Department of Justice, Washington, DC, for Defendants/Cross Defendant.

John P. Coyle, Duncan & Allen, Richard W. Schwartzman, Smith, Gambrell & Russell, LLP, Washington, DC, for Movant.

Katherine Lynn Rhyne, King & Spalding, Washington, DC, Lewis Bondurant Jones, Bruce P. Brown, Patricia Thrower Barmeyer, King & Spalding, Robert Todd Silliman, McKenna Long & Aldridge LLP, Atlanta, GA, Philip Dean Bartz, McKenna, Long & Aldridge & Norman, L.L.P., Washington, DC, Clay C. Long, Gregory W. Blount, William M. Droze, Troutman Sanders LLP, Atlanta, GA, Charles Anthony Zdebski, Troutman Sanders LLP, Barry M. Hartman, Kirkpatrick & Lockhart, LLP, Washington, DC, Teri L. Donaldson, Jonathan A. Glogau, Office of the Attorney General/FL, Tallahassee, FL, Jackson Roger Sharman, III, Nikaa Baugh Jordan, W. Larkin Radney, IV, William S. Cox, III, Lightfoot, Franklin & White, L.L.C., Birmingham, AL, for Intervenor.

Wallace F. Tillman, National Rural Electric Cooperative Association, Arlingtn, VA, for Amicus.

Clay C. Long, Atlanta, GA, for Cross Claimant.

## MEMORANDUM & ORDER

JACKSON, District Judge.

This case is presently before the Court for the sole purpose of the Court's review of a partial (and conditional) resolution of certain issues relating to the flow of river water through the Apalachicola–Chattahoochee–Flint ("ACF") Basin in the southeastern United States. The settlement, expressed in a 19–page Settlement Agreement with multiple attachments, is the culmination of protracted mediation ordered by the Court in March, 2001, and concluded in January, 2003. It represents no more than an armistice in a decades-long conflict between the constituencies who share the benefits and burdens of proximity to the Chattahoochee River, Buford Dam, and the reservoir created by the dam known as Lake Lanier in the State of Georgia.

If approved by the Court, the settlement will· not end the controversy over the waters of the Chattahoochee; it will merely moot for a time the dispute between the original protagonists in this case and the assenting intervenors. Nor will it end related litigation in the U.S. District Courts for the Northern District of Georgia ("N.D.Ga.") and the Northern District of Alabama ("N.D.Ala."). The dissenting intervenors (and others), moreover, will surely continue the contest elsewhere. The larger issue (which is *not* addressed by the settlement), namely, the apportionment of rights of usage of the waters of an interstate river between sovereign states, may·yet arise, but it·is neither present in the case·now, nor would it be within the jurisdiction of this Court if it were. *See* 28 U.S.C. § 1251(a) (2003). In short, the Settlement Agreement purports to adjust and formalize a tenuous working relationship between the U.S. Army Corps of Engineers ("Corps" or "Army") and some of the constituencies to whom it makes the fresh water it stores in Lake Lanier available for their several purposes.[1]

## I.

The Chattahoochee River originates in the mountains of northern Georgia, runs along the Alabama–Georgia border, joins the Flint River at the Florida–Georgia border (becoming the Apalachicola River), and eventually flows into the Gulf of Mexico. In the mid–1940s, with congressional approval, the U.S. Army Corps of Engineers built Buford Dam on the Chattahoochee River north of Atlanta, Georgia, creating Lake Lanier. Congress initially authorized Lake Lanier and Buford Dam expressly for flood control, navigation, and hydropower generation purposes, although the Corps asserts that the possibility of local water supply usage in the future was always in contemplation.[2] The water in Lake Lanier utilized for flood control, navigation, and hydropower purposes is called flow-through, meaning that the water is not consumed but flows through the Buford Dam into downstream rivers and, eventually, out into the Gulf of Mexico. Beginning in the 1970s, however, the Corps permitted some water stored in

1. The *right* to withdraw water for consumption from intrastate sources, including rivers traversing more than one state, is conferred by state, not federal law. The Corps has authority to allocate storage capacity in Corps-managed reservoirs to various purposes·under the Water Supply Act of 1958, 43 U.S.C. § 390b (2003).

2. All parties agree Lake Lanier was originally authorized for and used for flood control, navigation, and hydropower. Whether or not water supply was an original authorized use is a point of contention.

Lake Lanier to be reserved for local water supply, a use which consumes the water extracted, ostensibly diminishing the quantity available for flow-through.

As explained to the Court at oral argument, pursuant to the Water Supply Act of 1958 ("WSA"), *supra* n. 1, the Corps charges the beneficiaries of projects such as the Buford Dam and Lake Lanier for the benefits provided, the charges being proportioned to the ratio of the quantity of water allocated to storage for a particular use to the cost of a project's construction and operation.

The following history, somewhat oversimplified, emerges from the record before the Court.

The withdrawals made from water allocated to storage in Lake Lanier for local water supply were initially made under five-year interim withdrawal contracts renewable until July of 1989 at which time the Corps intended to convert to permanent storage space contracts which would necessitate a permanent reallocation of storage capacity to water supply rather than to flow-through uses. By 1988 the Corps had made interim contracts with the Atlanta Regional Commission ("ARC"), the cities of Cummings, Gainesville, Buford, Gwinnett County (all in Georgia, and hereinafter collectively referred to as "the Water Supply Providers"), and the State of Georgia itself. These contracts facilitated an aggregate withdrawal from the total storage capacity of Lake Lanier in ever-increasing amounts.

Although all of these contracts had expired by the end of 1989, the Corps allowed the withdrawals to continue unabated while it sought authority from Congress to negotiate permanent storage space contracts with the Water Supply Providers. In October of 1989, the Corps issued a draft water storage reallocation report for

submission to Congress proposing to allocate such a large quantity to storage for water supply as to alarm the downstream states Alabama and Florida.

Alabama reacted to the Corps' 1989 report by suing the Corps in N.D. Ala. The State of Florida moved to intervene on the side of Alabama, and the State of Georgia moved to intervene on the side of the Corps. Settlement negotiations began between the parties, and they sought a stay of the litigation. In a September 1990 order, N.D. Ala. granted a stay on the condition that the Corps not execute any permanent water supply contracts without prior approval from Alabama and Florida while the stay was pending. The stay order, although terminable unilaterally at the instance of any party, remained in place throughout the 1990s,[3] and the parties (and proposed intervenor states) filed periodic status reports updating N.D. Ala. about their progress in resolving the underlying dispute.

Settlement negotiations ultimately resulted in an interstate compact (the "ACF Compact"), approved by Congress in 1997, intended to provide "an orderly process by which the three states would achieve a water allocation formula," or, in other words, an agreement to agree. This left matters as they were when the lawsuit was filed in Alabama in 1990. The ACF Compact expired August 31, 2003, no agreement having been reached.

In the meantime the Corps continued to allow the Water Supply Providers to withdraw water stored in Lake Lanier for municipal and industrial consumption under *ad hoc* agreements in successively larger amounts each year, precipitating the instant lawsuit.

---

3. The Corps says it exercised its right of termination in September, 2003.

## II.

The plaintiff in this case, filed in December 2000, Southeastern Federal Power Customers, Inc. ("SeFPC"), is a non-profit corporate consortium of rural electric co-operatives and municipal electric systems supplying electric power to their customers in the southeastern United States. All of them derive a portion of the hydropower they distribute from the Buford Dam generating capacity. SeFPC complains, in substance, that cumulative withdrawals by the Water Supply Providers permitted by the Corps for municipal and industrial consumption have diminished the flow-through by which hydropower is generated. SeFPC's members have consequently been obliged to purchase more costly electrical power elsewhere, yet continue to pay for Buford Dam hydropower at prices disproportionate to their residual share of water stored in Lake Lanier devoted to power generation. In other words, they are paying prices that reflect a higher proportion of the Corp's costs for the benefits of Lake Lanier and Buford Dam than they currently receive, whereas the Water Supply Providers' payments are proportionately less. SeFPC prays for a declaratory judgment to the effect that the Corps' practice of allowing withdrawal of water for local municipal and industrial usage is *ultra vires*, under several statutes, and for a mandatory injunction compelling the Corps either to comply with those statutes or to grant them financial concessions to redress the inequity in their payment schedules.

Shortly after this lawsuit was filed, the State of Georgia and the Water Supply Providers moved to intervene, and SeFPC and the Corps were willing to include the aspiring intervenors in the mediation about to commence in March, 2001. Following nearly two years of negotiations, in January, 2003, the participants, SeFPC, the Corps, ARC, the Water Supply Providers, and the State of Georgia advised the Court that they had reached an agreement and requested a status conference with the Court to present the Settlement Agreement for its approval. Two weeks later, the States of Alabama and Florida (who were aware of the mediation but made no effort to participate) also moved to intervene in the instant lawsuit to challenge the settlement, and shortly thereafter, they also revived the moribund litigation in N.D. Ala. by an application for a preliminary injunction asking that court to declare the Settlement Agreement null and void as in violation of the stay ordered in 1990.

On October 15, 2003, Judge Bowdre of N.D. Ala., granted Alabama's and Florida's motion for a preliminary injunction and enjoined the Corps and Georgia (the only two defendants before it) from executing or implementing the District of Columbia Settlement Agreement and barred them from entering into any other new storage or withdrawal contracts affecting the ACF Basin without approval of N.D. Ala. *See Alabama v. Army Corps of Engineers,* No. CV 90–BE–1332, Preliminary Injunction (N.D. Ala. entered October 15, 2003).[4]

## III.

Having now been granted leave to intervene in the District of Columbia case in this Court, (as have the Water Supply Providers and Georgia), Alabama and Florida oppose the approval of the proposed Settlement Agreement. For the reasons explained below, the Court will approve and validate the Settlement Agreement, with the *proviso* that the Settlement Agreement may not be executed or implemented until the injunction en-

---

**4.** The Court is advised that a related case is also pending in N.D. Ga., *Georgia v. Army Corps of Engineers,* No. 01–0026–CV–RWS–2 (N.D. Ga. filed Feb. 7, 2001).

tered by N.D. Ala. has been dissolved. However, more entities purporting to be affected by the manner in which the Corps makes disposition of the water storage capacity under its control in Lake Lanier are now subject to the jurisdiction of this Court than are before either N.D. Ala. or N.D. Ga. It is therefore appropriate for this Court to address the validity of the Settlement Agreement in the first instance to minimize the prospects of duplicative litigation and inconsistent adjudicative results.

██ As has been said many times, "[i]t is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement." *Armstrong v. Bd. of Sch. Dirs. of Milwaukee,* 616 F.2d 305, 312 (7th Cir. 1980). Typically, a settlement agreement should be approved if it is "fair, adequate and reasonable," so long as it is not "illegal" or "contrary to public policy." *See United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977) (court must consider "overall fairness to [the parties] and consistency with the public interest") (citation omitted). Nevertheless, "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement. A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors; if properly raised, these claims remain and may be litigated by the intervenor." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).

### IV.

██ Reiterating contentions made by SeFPC about the Corps' current *ad hoc* arrangements with the Water Supply Providers, Alabama and Florida claim that the Corps lacks the necessary statutory authority to make and carry out the obligations it commits itself to undertaking in the Settlement Agreement without prior congressional approval. They also claim that the terms of the Settlement Agreement violate a number of federal statutes, namely the National Environmental Protection Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* (2003), the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.* (2003), the Water Resources Development Act of 1988 ("WRDA"), 33 U.S.C. § 2312 (2003), and the Flood Control Act ("FCA"), 33 U.S.C. § 708 (2003). While these objections might at some later date present grounds upon which to prevent the implementation of portions of the Settlement Agreement, they are not sufficiently definite and imminent to justify invalidation of the Settlement Agreement at its inception or in its entirety.

The Corps' authority to manage water storage in Lake Lanier is controlled by the WSA, 43 U.S.C. § 390b. The WSA, passed in 1958, and amended most recently in 1986, grants the Army, *i.e.* the Corps, limited authority to permit water *storage* at existing projects that had not been planned or granted initial authorization for such a purpose. In doing so, however, the WSA limits the extent to which the Army may change an existing project without first getting congressional approval. The WSA states that "[m]odifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section *which would seriously affect the purposes for which the project was authorized,* surveyed, planned, or constructed, or which would involve major structural or operational changes *shall be made only upon the approval of Congress as now provided by law.*" 43 U.S.C. § 390b(d) (emphasis added).

The test for WSA compliance is, therefore, whether the Settlement Agreement will seriously affect the purposes for which Lake Lanier was originally authorized. All agree that the original purposes for which the Lake Lanier/Buford Dam project was undertaken were for hydropower, flood control, and navigation, but sharply disagree as to whether or not Lake Lanier was originally intended for "water supply" as well. The issue is immaterial, however, because the Settlement Agreement makes no disposition of the water in Lake Lanier itself. Rather, the Settlement Agreement deals solely with the subject of water storage. While Alabama and Florida may be apprehensive that Georgia will allow the Water Supply Providers to take their fill up to their storage quota, the actual extraction of water stored in Lake Lanier for water supply purposes is entirely governed by the permitting process administered by the State of Georgia. The Corps itself has no authority to control water withdrawals. Under the WSA, it can only reserve the storage from which those withdrawals may be made. Even if the Settlement Agreement were to authorize all of Lake Lanier as water storage for municipal and industrial water supply, the actual withdrawal of that water would be up to the state permitting authorities.

■ The critical question in gauging its compliance with the WSA is, therefore, whether the Settlement Agreement's adjustments to water storage and allocation will "seriously affect" the *other* authorized purposes of Lake Lanier - hydropower, navigation, and flood control - and so far as appears from the record before the Court the only "purpose" affected, if at all, appears to be hydropower generation. No proof is presented to suggest that either navigation or flood control would be seriously impaired, and the SeFPC, the Power Suppliers, supports the Settlement Agreement and intends to become a signatory.[5]

### V.

■ Alabama and Florida further claim that the Settlement Agreement violates a number of federal statutes, namely NEPA, 42 U.S.C. §§ 4321 *et seq.*, the ESA, 16 U.S.C. §§ 1531 *et seq.*, the WRDA, 33 U.S.C. § 2312, and the FCA, 33 U.S.C. § 708. The Court does not agree.

■ NEPA is, of course, implicated whenever an agency recommends major federal action to Congress that could have significant impact on the environment. NEPA requires that "all agencies of the Federal Government...include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on" any environ-

---

5. Florida and Alabama also cite to an internal Corps' regulation which states in pertinent part:

> Reallocation or addition of storage that would seriously affect other authorized purposes or that would involve major structural or operational changes requires Congressional approval. Provided these criteria are not violated, 15 percent of the total storage capacity allocated to all authorized project purposes or 50,000 acre feet, whichever is less, may be allocated from storage authorized for other purposes. USACE ER 1105-2-100, para. 3-8(b)(5) (April 22, 2000).

Assuming the States have standing to raise the issue, *see Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998), internal agency rules "not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion" do not afford a basis to invalidate an exercise of that discretion. *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538-39, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). *See also Kugel v. United States*, 947 F.2d 1504, 1507-08 (D.C.Cir.1991).

mental effect the action will have and any alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(i)-(v) (2003). The Settlement Agreement will require the Corps to both reallocate water storage in Lake Lanier for water supply use, and to recommend to the Office of Management and Budget ("OMB") that it ask Congress to take action to make those reallocations permanent. Alabama and Florida postulate that a significant effect on the quality of the environment will ensue.

The parties to the Settlement Agreement do not dispute that a NEPA analysis must be completed. Section 3.1 memorializes that understanding by making the successful completion of the NEPA analysis a condition subsequent to the execution of the Settlement Agreement. Section 3.1 begins: "Subject to the completion of the NEPA Process the Army will enter into the Interim Contracts..."

Alabama and Florida argue that the NEPA analysis must be completed *before* the Corps can enter into the Settlement Agreement, because § 3.2.1 of the Settlement Agreement obligates the Corps to "move expeditiously after...the completion, expiration or termination of the [ACF] Compact negotiations...to recommend that OMB support Congressional action to make the storage covered by the Interim Contracts available on a permanent basis." The ACF Compact negotiations having now terminated, Alabama and Florida contend that the Corps will be committed to make its recommendation to OMB as soon as the Settlement Agreement is signed, presumably before a NEPA analysis would be completed.

█ NEPA requires than an agency undertake the required environmental studies at "an early stage when alternative courses of action are still possible..."

*Envtl. Def. Fund Inc. v. Andrus*, 596 F.2d 848, 852 (9th Cir.1979). *See also Mobil Oil Corp. v. F.T.C.*, 562 F.2d 170, 173 (2d Cir.1977) (An environmental impact statement is required when the "critical agency decision" is made which results in "irreversible and irretrievable commitments of resources" to an action which will affect the environment); *Sierra Club v. Peterson*, 717 F.2d 1409, 1414 (D.C.Cir.1983) ("NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment.").

A recommendation to OMB to make a recommendation to Congress, however, does not represent an irreversible and irretrievable commitment of resources. Indeed it is debatable whether even a "permanent" contract for water storage is a commitment of resources if the contract is voidable for having failed a NEPA evaluation.

In any event, the Settlement Agreement provides the Corps with the ability to nullify the proposed contracts should the NEPA analysis require. Section 3.1 explicitly conditions implementation of the Settlement Agreement on "completion of the NEPA Process." Despite Alabama and Florida's concerns, Section 3.2.1 leaves the timing of its recommendation to OMB to the Corps' discretion. If it decides the NEPA process must be completed first, the Corps will simply have to complete the process before "expeditiously" making its recommendation to OMB. And if not, should its undertakings in the Settlement Agreement not pass NEPA scrutiny, they will no longer be obligatory, whether or not a recommendation to OMB or to Congress has gone forth.[6]

Florida and Alabama assert that the Settlement Agreement's very existence

---

6. The Corps has apparently never conducted a NEPA analysis for the water supply withdrawals begun in 1973 and continued to this day.

will prejudice any truly neutral NEPA-mandated analysis: The Settlement Agreement, they say, "ratifies" the continuation of ongoing water supply withdrawals under expired contracts without subjecting the issue of water supply allocation itself to any NEPA process. Essentially, the argument continues, the Corps is assuming the legality of using Lake Lanier for water supply prior to engaging in NEPA analysis, thereby reversing the order of the decision-making process. The Settlement Agreement may, for example, be deemed a baseline for NEPA evaluation that will begin at an artificially high point because NEPA might enable the Corps to compare a proposed change in water use at Lake Lanier to a "no action alternative."

Moreover, they say, the Settlement Agreement does not consider any possible alternatives; either the changes in water storage will be undertaken in accordance with the Settlement Agreement or not at all. Assessing alternatives, however, is not the function of the Settlement Agreement. NEPA *does* require that alternatives be studied. Assuming the Corps carries out an appropriate NEPA review, alternatives will be considered by the Corps and presumably by Congress.

This Court declines to accept the States' cynical reading of the Settlement Agreement, or their similarly bleak assessment of the Corps' intentions with respect to it. The Settlement Agreement does not "ratify" the existing (now expired) contracts, or anything else, but merely leaves in place a *de facto status quo* which will presumably persist if a settlement never comes to pass until the Corps decides (or is compelled) to halt it. Further, Section 3.1.3(e) does not state that the existing state of water storage and supply will serve as a NEPA baseline; it simply says that if no changes are made to the current state of water supply, the Water Supply Providers will be responsible for paying certain costs which will be determined on the basis of what the Water Supply Providers currently pay.

In any event, Alabama and Florida can make known their concerns about water supply usage or the appropriate baseline to use for impact analysis during the public comment phase of the NEPA review process, and if unsuccessful there, later to Congress.

## VI.

█ If the Settlement Agreement does not founder on the absence of a pre-existing NEPA assessment, then Alabama and Florida argue that the Settlement Agreement violates provisions of the ESA, 16 U.S.C. §§ 1531 *et seq.*, the WRDA, 33 U.S.C. § 2312, and the FCA, 33 U.S.C. § 708. The ESA requires that all federal agencies assure that "any action authorized, funded, or carried out by" that federal agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species..." 16 U.S.C. § 1536(a)(2). The WRDA imposes a notice-and-comment obligation on federal agencies prior to making "changes in the operation of any reservoir which will result in or require a reallocation of storage space in such reservoir or will significantly affect any project purpose..." 33 U.S.C. § 2312. The FCA grants the Corps the authority to enter into contracts with States and municipalities for the purchase and use of "surplus" water, provided that "no contracts for such water shall adversely affect then existing lawful uses of such water." 33 U.S.C. § 708.

The short answer to these challenges is that the NEPA process to be undertaken as contemplated by the Settlement Agreement will meet the Corps' burden under each of these statutes. NEPA will require environmental analysis of the effect of all

the Settlement Agreement's provisions, including an assessment of the effects of the changes wrought upon endangered species and upon the purposes of the Buford Dam and existing lawful uses of Lake Lanier, to be preceded by a notice-and-public comment period.

## VII.

There remains to be considered the effect of the current status of the companion litigation in N.D. Ala. upon the validity of the Settlement Agreement.

To the extent the conditional stay of proceedings entered by that court in 1990 might have operated to preclude the Corps' assent to the Settlement Agreement here, it appears that stay was vacated by the unilateral notice to that effect filed by the Corps in September, 2003, and should no longer serve to bar it today. Whether the Corps' activities in connection with the mediation that resulted in the settlement prior to dissolution of the stay constituted a violation of its order, and if so, what consequences should attach, are matters for N.D. Ala. to decide.

Unlike the 1990 stay order, however, Judge Bowdre's preliminary injunction of October 15, 2003, remains in force. Comity, and respect for the orders of other co-equal courts are important public policy objectives and this Court may not disregard a valid and operative injunction of another federal district court so long as it remains so. See Common Cause v. Judicial Ethics Comm., 473 F.Supp. 1251, 1253 (D.D.C.1979) ("the interests of comity mandate respect for the holding of a sister court when a de novo review has the potential effect of subjecting one party to conflicting orders from two courts of comparable jurisdiction and authority"). See also Mann Mfg. Inc. v. Hortex, Inc., 439 F.2d 403 (5th Cir.1971).

For similar reasons, however, Judge Bowdre's injunction has no effect on the jurisdiction of this Court, and in fact, the Court understands Judge Bowdre to have stayed proceedings in her court pending this Court's ruling on the validity of the Settlement Agreement. See Alabama v. Army Corps of Engineers, No. CV 90–BE–1331–E, Order to Stay (N.D. Ala. entered Nov. 24, 2003). Accordingly, this Court concludes that the Settlement Agreement is fair and reasonable, and neither illegal nor contrary to public policy. Execution of the Settlement Agreement, and any implementation thereof, is however, subject to Judge Bowdre's injunction, and to that end, before they may act under the Settlement Agreement, the parties to it must first obtain dissolution of the injunction in N.D. Ala.

For the foregoing reasons, it is, this 10th day of February, 2004,

ORDERED that the objections of the States of Alabama and Florida to the Settlement Agreement are overruled; and it is

FURTHER ORDERED that the Settlement Agreement negotiated by the parties (including assenting intervenors) to Southeastern Federal Power Customers v. Caldera, No. CA 00–2975(TPJ), is hereby declared valid and approved, and may be executed and filed and thereafter performed in accordance with its terms; provided, however, that the preliminary injunction entered by N.D. Ala. on October 15, 2003, is first vacated.