# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 16, 2007       Decided February 5, 2008

No. 06-5080

SOUTHEASTERN FEDERAL POWER CUSTOMERS, INC.,
APPELLEE

v.

PETER GEREN, SECRETARY OF THE
UNITED STATES DEPARTMENT OF THE ARMY, ET AL.,
APPELLEES

STATE OF FLORIDA,
APPELLANT

———

Consolidated with
No. 06-5081

———

Appeals from the United States District Court
for the District of Columbia
(No. 00cv02975)

———

*Parker D. Thomson* argued the cause for appellant State of Florida. *Matthew H. Lembke* argued the cause for appellant State of Alabama. With them on the briefs were *Bill McCollum*, Attorney General, Attorney General's Office of the State of Florida, *Jonathan A. Glogau*, Chief, Complex Litigation, *James*

*T. Banks*, *William S. Cox, III*, *W. Larkin Radney, IV*, and *Scott B. Smith*. *R. Craig Kneisel*, *Christopher M. Kise*, *Donald G. Blankenau*, *H. Christopher Bartolomucci*, and *Lauren J. Caster* entered appearances.

*Deborah M. Murray* was on the brief for *amici curiae* Alabama Rivers Alliance, et al. in support of appellants. *Mary M. Asbill* entered an appearance.

*Michael T. Gray*, Attorney, U.S. Department of Justice, argued the cause for federal appellee. *Bruce P. Brown* argued the cause for appellees State of Georgia, et al. *Clinton A. Vince* argued the cause for appellee Southeastern Federal Power Customers, Inc. With them on the brief were *Robert H. Oakley*, Attorney, U.S. Department of Justice, *Thurbert E. Baker*, Attorney General, Attorney General's Office for the State of Georgia, *R. Todd Silliman*, *William M. Droze*, *J. Cathy Fogel*, *David A. Fitzgerald*, *Patricia T. Barmeyer*, and *Lewis B. Jones*. *Orlando E. Vidal*, *Philip D. Bartz*, and *Charles A. Zdebski* entered appearances.

*Susan N. Kelly*, *Wallace F. Tillman*, and *Mary Ann Ralls* were on the brief for *amici curiae* American Public Power Association and National Rural Electric Cooperative Association in support of appellees.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion by *Senior Circuit Judge* SILBERMAN concurring in the judgment.

ROGERS, *Circuit Judge*:   This case arises out of the requirements of three States for water stored in a federal reservoir.  The States of Alabama and Florida appeal the order of the district court approving a Settlement Agreement between Southeastern Federal Power Customers, Inc. ("Southeastern"), a group of Georgia water supply providers ("Water Supply Providers"), the U.S. Army Corps of Engineers (the "Corps"), and the State of Georgia.  The Agreement provides for a ten or twenty year "temporary" reallocation of over twenty percent (20%) of the water storage in the Lake Lanier reservoir, which is located in the State of Georgia and operated by the Corps. Alabama and Florida contend that the Agreement violates the Water Supply Act ("WSA"), 43 U.S.C. § 390b(d), the Flood Control Act ("FCA"), 33 U.S.C. § 708, and the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et. seq.  We need address only one of the statutory challenges. Under the WSA, the Corps must obtain prior Congressional approval before undertaking "major . . . operational changes." § 301(d), 43 U.S.C. § 390b(d).  Because the Agreement's reallocation of Lake Lanier's storage space constitutes a major operational change on its face and has not been authorized by Congress, we reverse the district court's approval of the Agreement.

## I.

The setting for this case is Lake Sidney Lanier, a federally owned reservoir operated by the Corps and located in Georgia. It was created by the construction of the Buford Dam on the Chattahoochee River, approximately fifty miles northeast of the city of Atlanta.   To the south of the Buford Dam, the Chattahoochee joins the Flint River and the two become the Apalachicola River, which flows through northern Florida and eventually into the Gulf of Mexico.  The three river systems

make up the Apalachicola-Chattahoochee-Flint river basin ("ACF Basin"), which includes counties in Alabama.

Congress authorized the Corps to design and build Buford Dam in 1946, and the project was completed in the mid-1950s. Beginning in the 1970s, the Corps entered into a series of five-year renewable contracts that allowed some of Lake Lanier to be used for storage of local water supply. *See Se. Fed. Power Customers, Inc. v. Harvey*, 400 F.3d 1, 2 (D.C. Cir. 2005). The last of the local water storage contracts expired in 1990, but the Corps has permitted the withdrawal of water, in increasing amounts, under the terms of the expired contracts. *Id*.

In 1989, before the expiration of the last temporary local water storage contract, the Corps transmitted a report to Congress recommending that 207,000 acre-feet of storage in Lake Lanier be reallocated from hydropower to local consumption, noting that this might require Congressional approval. USACE, POST AUTHORIZATION CHANGE NOTIFICATION REPORT FOR THE REALLOCATION OF STORAGE FROM HYDROPOWER TO WATER SUPPLY AT LAKE LANIER, GEORGIA ("PAC REPORT") 1, 12, 26 (1989). In response, Alabama sued the Corps in the federal district court in the Northern District of Alabama, seeking to enjoin reallocation of Lake Lanier's storage space to water supply. This litigation resulted in a stay order, *Alabama v. USACE*, No. CV90-H-1331-B (N.D. Ala. Sept. 19, 1990), and no permanent water storage reallocation was undertaken despite the recommendations of the PAC REPORT. In 1992, Alabama, Florida, Georgia and the Corps entered into a Memorandum of Agreement allowing existing withdrawals to continue or increase in response to reasonable demand; in 1997, the same three States and Congress approved the Apalachicola-Chattahoochee-Flint River Basin Compact ("Compact") to facilitate water storage allocation, planning and dispute resolution in the ACF Basin. Pub. L. No.

105-104, 111 Stat. 2219. The Compact, which did not assign rights to any quantity of water, *id*. at 8, terminated on August 31, 2003, without resulting in an agreement on the allocation of water storage resources.

In 2000, Southeastern sued the Corps in the federal district court in the District of Columbia, challenging the Corps' statutory authority to divert water from Lake Lanier to the detriment of hydropower users and alleging economic injury stemming from increased withdrawals of water from Lake Lanier, which allegedly compromised use of Lake Lanier's water for power generation. Georgia thereafter petitioned the Assistant Secretary of the Army for Civil Works to formally reallocate reservoir storage space for local consumption — effectively requesting a threefold increase in the amount of space devoted to local water supply. In 2001, not having received a response to its request, Georgia sued the Corps in the federal district court in the Northern District of Georgia. In 2002, Georgia's request was denied. By letter of April 15, 2002, the Acting Assistant Secretary of the Army for Civil Works explained that because "[t]his request involves substantial withdrawals from Lake Lanier and accommodating it would affect authorized project purposes . . . [the matter had been referred to] the Office of the Army General Counsel, [and t]hat office has . . . concluded that it cannot be accommodated without additional Congressional authorization." Letter from R. L. Brownlee, to Hon. Roy E. Barnes, Governor of Georgia (Apr. 15, 2002), *citing* Memorandum of Earl Stockdale, Deputy Gen. Counsel, Dep't of the Army, regarding Georgia Request for Water Supply from Lake Lanier (Apr. 15, 2002) ("Army Legal Memorandum"). The Georgia lawsuit is currently abated. *Georgia v. USACE*, 223 F.R.D. 691, 699 (N.D. Ga. 2004).

Meanwhile, in March 2001, the D.C. district court referred the parties to mediation, where they were eventually joined by

Georgia and the Water Supply Providers. The parties negotiated the Agreement at issue and signed it in January 2003. The Agreement specifies that Lake Lanier's storage space is 1,049,400 acre-feet. It requires the Corps to allocate between 210,858 and 240,858 acre-feet of Lake Lanier's water storage to local municipal and industrial uses for a once-renewable period of ten years; the exact amount of space allocated depends on whether Gwinnett County chooses to purchase all of the storage space to which it is entitled. If, under the Agreement, all of the storage space that may be officially dedicated to local consumption is, then the reallocation constitutes more than twenty-two percent (22%) of the total storage space in Lake Lanier and approximately nine percent (9%) more of the total storage space than was being allocated for local use in 2002. *Compare* Agreement at 5, *and* Army Legal Memorandum at 8, *with* Agreement at 6. The interim ten-year leases will become permanent if Congress approves the change in use or a final court judgment holds that such approval is not necessary, Agreement at 10, and the Corps commits to recommending that Congress formally "make the storage covered by the Interim Contracts available on a permanent basis," *id*. at 11. The Agreement also provides hydropower generators with payments in the form of "credit to be reflected in hydropower rates," based on "revenues paid into the United States Treasury [under contracts based on the Agreement]," to compensate for lost opportunities related to its reallocation of water storage rights. *Id*. at 13.

In October 2003, after the Agreement was signed, the D.C. district court allowed Alabama and Florida to intervene and denied the motions to transfer the case to the Georgia district court; Alabama and Florida also resuscitated the Alabama lawsuit that was filed in 1990. On October 15, 2003, the Alabama district court entered a preliminary injunction, preventing the Agreement from being implemented. The D.C.

district court approved the Agreement on February 10, 2004, contingent upon the "dissolution of the [Alabama district court's] injunction." *S. Fed. Power Customers v. Caldera*, 301 F. Supp. 2d 26, 35 (D.D.C. 2004). The district court rejected Alabama's and Florida's argument that the Agreement exceeded the authority conferred on the Corps by Congress, including applicable provisions of the WSA, the FCA and NEPA. *Id*. at 31. It also concluded that while the Agreement would affect hydropower generation, an original purpose of Lake Lanier, the assent of the hydropower generators meant that Congressional approval for the allocation of storage space was not required. *Id*. at 31-32. The district court quoted the WSA's "operational change" provision, but did not explicitly address this issue. *See id*.

This court dismissed the initial appeal filed by Alabama and Florida for lack of a final order, in view of the conditional nature of the district court's approval of the Agreement. *Se. Fed. Power*, 400 F.3d at 5. Following the dissolution of the Alabama district court's injunction, *Alabama v. USACE,* 424 F.3d 1117, 1136 (11th Cir. 2005), the D.C. district court, on March 9, 2006, entered a final judgment that is the basis for this appeal by Alabama and Florida.

## II.

Alabama and Florida contend that the Agreement should be set aside because it violates the WSA, the FCA, and NEPA. They maintain that the reallocation in the Agreement requires Congressional approval under the WSA because it both constitutes a major operational change and seriously affects project purposes. They also contend that the Agreement violates the FCA because it allows only the short-term sale of surplus water, whereas the Agreement is a long-term transaction involving water that is not surplus; because the FCA prohibits

negatively affecting existing uses of affected water; and because the Agreement is contrary to the Corps' internal FCA contracting guidelines. Finally, they contend that the Agreement violates NEPA by "irrevocably committ[ing] [the Corps] to executing the [Agreement] at the completion of its NEPA analysis," Appellants' Br. at 48, effectively bypassing the statute. [1]

The court reviews the fairness of a settlement agreement for abuse of discretion. *Moore v. Nat'l Ass'n of Sec. Dealers, Inc.*,

---

[1] Alabama's and Florida's contention that the district court abused its discretion in denying the motion to abate or transfer this case to the Alabama district court is without merit. They note that the Georgia district court abated the case before it in favor of the prior-filed Alabama case, *Georgia*, 223 F.R.D. at 697-99, and that they urged the D.C. district court to do likewise on the grounds that the Alabama and D.C. cases involve substantially the same parties and subject matter, the Alabama lawsuit was first filed, the Alabama court is more convenient, and the "equities weigh in favor of abatement." Appellants' Br. at 58. However, the district court adequately justified its denial of the motion and did not abuse its discretion. *See Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 349 (D.C. Cir. 2003). The district court explained that "more entities purporting to be affected by the manner in which the Corps makes disposition of the water storage capacity . . . in Lake Lanier are now subject to the jurisdiction of this [district c]ourt than are before [the Alabama district court]," and reasonably concluded that the prospects of "duplicative litigation and inconsistent adjudicative results" were reduced by its review of the Agreement. *Caldera*, 301 F. Supp. 2d at 31. Hence, because reversal is not justified, the court need not decide whether 28 U.S.C. § 2105, which precludes reversal by "a court of appeals for error in ruling upon matters in abatement which do not involve jurisdiction," prevents review of the abatement motion. *Cf. Nascone v. Spudnuts, Inc.*, 735 F.2d 763, 771 (3d Cir. 1984); *see also* 15A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3903 (3d ed. 2007).

762 F.2d 1093, 1106 (D.C. Cir. 1985). Although there are few precedents on review of a settlement agreement for compliance with statutory requirements, the district court could hardly approve a settlement agreement that violates a statute, *see, e.g.*, *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1355 (9th Cir. 1990), and this court owes the district court no deference in its legal interpretations. Our statutory review then is *de novo*, although this is largely a matter of semantics: "A district court by definition abuses its discretion when it makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996); *see also Donovan v. Robbins*, 752 F.2d 1170, 1178 (7th Cir. 1984). In considering the Corps' interpretation of its statutory authority to enter into the Agreement, the court applies the familiar two-step analysis under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

> [Where] Congress has directly spoken to the . . . issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress . . . if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id*. at 842-43.

Section 301 of the WSA, 43 U.S.C. § 390b, addresses the development of "water supplies for domestic, municipal, industrial, and other purposes," specifically acknowledging that primary responsibility for their development is lodged in States and localities. *Id*. § 301(a), § 390b(a). It authorizes storage "in any reservoir project surveyed, planned, constructed or to be planned . . . by the Corps of Engineers or the Bureau of Reclamation" so long as the costs of construction or

modification are adequately shared by the beneficiaries. *Id*. § 301(b), § 390b(b). The WSA provides, however, that:

> Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section which would seriously affect the purposes for which the project was authorized, surveyed, planned, or constructed, or which would involve *major* structural or *operational changes* shall be made only upon the approval of Congress as now provided by law.

*Id*., § 301(d), § 390b(d) (emphasis added).

Alabama and Florida contend that the Agreement's reallocation of up to 240,858 acre-feet of storage space to the Water Supply Providers constitutes a "major . . . operational change[]" and thus requires Congressional approval. They point to previous analyses prepared by the Corps and the Office of the Army General Counsel indicating that operational changes on a similar scale would require Congressional approval. *See, e.g.*, PAC REPORT at 12; Army Legal Memorandum at 12. Appellees offer that the Agreement "merely leaves in place . . . [t]he status quo [of] incremental increases in withdrawal amounts by the Water Supply Providers as those increases are permitted by Georgia," Appellees' Br. at 37, and thus does not constitute an operational change. They would distinguish the 2002 Army Legal Memorandum on the basis that Georgia's request involved a larger percentage of Lake Lanier than the storage allocated by the Agreement and included projections that were thirty as opposed to ten years in the future. Appellees further offer that the Agreement provides for compensation payments to hydropower producers, thus "retaining the hydropower benefit and adding the water benefit," *id*. at 38. Finally, Appellees offer

that the reallocation is temporary rather than permanent, and thus does not require Congressional approval.

**1.**

As a threshold matter, we hold that Alabama and Florida have standing to challenge the Agreement insofar at it constitutes a major operational change to the Lake Lanier reservoir.[2] They credibly claim to fear that the proposed reallocation of water storage will result in "diminish[ed] [] flow of water reaching the downstream states." Appellants' Br. at 2. The Agreement does potentially reduce the amount of water flowing downstream, Agreement at 5; *Alabama*, 424 F.3d at 1122, and the ACF basin would thereby be affected by changes to the quantity of water in the Chattahoochee River for as long as twenty years, *see, e.g.*, Agreement at 10; *cf. Georgia v. USACE*, 302 F.3d 1242, 1252 (11th Cir. 2002). As the ACF basin includes parts of both Alabama and Florida, they would be directly impacted by the Agreement's proposed changes to water storage uses; in its complaint, Florida alleged various negative environmental impacts from reduced water flow. In addition, the states' quasi-sovereign interests" entitles them to "special solicitude" in standing analysis. *See Massachusetts v. EPA*, 127 S. Ct. 1438, 1455 (2007). To the extent the Agreement provides that "entering into the storage contracts described in this Agreement . . . potentially gives rise to certain obligations under NEPA," Agreement at 14, any attendant delay due to the Corps' compliance with NEPA does not affect the imminence of the claimed injury. The Agreement commits the Corps to use its "best efforts to complete any applicable requirements of NEPA

---

[2] The court, therefore, has no occasion to consider whether Alabama and Florida would have standing to challenge the Agreement as "seriously affect[ing]" the original Congressionally authorized purposes of Lake Lanier. *Cf.* Opinion Concurring in the Judgment (hereinafter, Concurring Op.) at 3.

as expeditiously as practicable." *Id*.; *cf. Massachusetts*, 127 S.Ct. at 1456. In addition, the Agreement states that its NEPA compliance provision "does not apply to the Supplement to Relocation Contract" between the Corps and the City of Gainsville allowing removal of water from Lake Lanier from the date of settlement, Agreement at 12, 14.

Alabama and Florida thus show both the imminence of injury-in-fact and its causation, and reversing the approval of the Agreement would provide redress to their injury. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Alabama's and Florida's prudential standing is likewise established because they come within the zone of interests that Congress could reasonably have intended to protect. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-401 (1987).

**2.**

Section 301 of the WSA plainly states that a major operational change to a project falling within its scope requires prior Congressional approval.[3] Consistent with this plain text, the Corps has long recognized that its discretion to alter a project's operations without Congressional approval is limited to non-major matters. It acknowledged in the 1989 PAC REPORT, at 12, that Congressional approval might be required for reallocation of 207,000 acre-feet, or approximately twenty percent (20%) of Lake Lanier's total current storage as specified in the Agreement. In 2002, on the basis of a legal opinion from the Office of the Army General Counsel, the Corps rejected Georgia's request that 370,930 acre-feet, approximately thirty-

---

[3] The Corps has not suggested that "the approval of Congress" required by the statute means anything other than a bill or resolution passed by both Houses that is either signed by the President or passed by two-thirds of both Houses over the President's veto. *Cf.* U.S. CONST. art. I, § 7.

five percent (35%) of Lake Lanier's total storage, be reallocated to local use. That legal opinion concluded that Georgia's request was of a magnitude that would "involve substantial effects on project purposes and major operational changes" and therefore required prior Congressional approval. Army Legal Memorandum at 1; *see also id*. at 9, 13. This conclusion was based on a comprehensive analysis: The Army Legal Memorandum identified the "specifically authorized purposes [of Lake Lanier] . . . . [as] navigation, hydropower generation, and flood control — with water supply as an incidental benefit," *id*. at 6; reviewed relevant congressional authorizations, beginning with the Rivers and Harbor Acts of 1945, noting that, according to engineers' reports, water supply was an "incidental benefit" of the Dam; and cited statutory limitations on the Corps' authority to modify any existing project under the WSA, *id*. at 3-9, referencing a House subcommittee report contrasting the Corps' authority to make "minor modifications" as distinct from "major changes in a project" and observing that "[t]he Corps' view of its discretionary authority in this area comports with that of Congress," *id*. at 10-11 (quoting U.S. HOUSE COMM. ON PUBLIC WORKS, SUBCOMM. TO STUDY CIVIL WORKS, REPORT ON THE CIVIL FUNCTIONS PROGRAM OF THE CORPS OF ENGINEERS, 82ND CONGRESS at 22 (1952)). The Corps' legal defense of then-existing water withdrawals was limited to a footnote, without citation to authority, which stated that "the agency does have the discretionary authority to meet the current water supply needs of the municipalities surrounding the reservoir," *id.* at 8 n.2.

On its face, then, reallocating more than twenty-two percent (22%, approximately 241,000 acre feet) of Lake Lanier's storage capacity to local consumption uses, *see* Agreement at 5-6, constitutes the type of major operational change referenced by the WSA; the reallocation's limitation to a "temporary" period of twenty years does not change this fact. Even a nine percent

(9%, approximately 95,000 acre feet) increase over 2002 levels for twenty years is significant. Appellees' contrary arguments are unpersuasive.

First, Appellees maintain that the Agreement simply reflects the status quo of gradual water storage reallocation, and consequently does not constitute a major operational change. But the appropriate baseline for measuring the impact of the Agreement's reallocation of water storage is zero, which was the amount allocated to storage space for water supply when the lake began operation. Otherwise, under Appellees' logic, even if the Agreement had simply kept in place a series of interim agreements that allocated all of Lake Lanier to storage for local consumption, no major operational change would have occurred — a chain of logic that would effectively bypass section 301(d) of the WSA, 43 U.S.C. § 390b(d).[4] Even taking the status quo as the consumption level in 2002, the reallocation of approximately nine percent (9%, approximately 95,000 acre feet) of storage space for a twenty-year period is still significant. As the Corps acknowledged during oral argument, the change from current local usage storage to the storage levels envisioned by the Agreement would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval. Oral Arg. Tape (Nov. 16, 2007) at 45:16.5.

---

[4] The court, in responding to the Corps' defense of its approval of the Agreement, has no occasion to opine whether the Corps' previous storage reallocations were unlawful. *See* Concurring Op. at 3-4. The court relies only on initial allocations of water storage — a more limited issue than would be presented were the court to address the original Congressional purposes of Lake Lanier alluded to by our colleague, *see id*. at 3. In any event, it is hardly "draconian," *id*. at 4, to follow Congress' explicit instructions for prior approval of major operational changes.

Second, Appellees maintain both that the amount of storage space reallocated by the Agreement is too limited to qualify as a major operational change, and that the Agreement's compensation of hydropower users prevents the reallocation from constituting a major operational change. But in defending the Agreement, Appellees provide no rational reason to explain why a reallocation of approximately thirty-five percent (35%) of total storage, taking into account thirty years of future local needs, constitutes a major operational change, *see* Army Legal Memorandum at 9, 12; Agreement at 6, whereas a reallocation of more than twenty-two (22%) of total storage, taking into account twenty years of future local needs, does not. *See* Agreement at 5-6, 10. In suggesting that the Agreement's compensation for the loss of hydropower uses is meaningfully different from Georgia's reallocation request in 2000, Appellees ignore the fact that even if compensation provides hydropower producers the full financial benefit they would have received from use of Lake Lanier in the absence of the water storage reallocation, a major operational change still occurs because there is less flow through as a result of increased water storage for local use.

Third, Appellees maintain that the absence of a permanent reallocation under the Agreement removes the need for prior congressional approval. But it is unreasonable to believe that Congress intended to deny the Corps authority to make major operational changes without its assent, yet meant for the Corps to be able to use a loophole to allow these changes as long as they are limited to specific time frames, which could theoretically span an infinite period. Appellees' attempt to respond by suggesting a time period of ninety-nine years "'might cause a serious impact,'" Appellees' Br. at 38 n.6 (quoting counsel for the Corps during oral argument before the D.C. district court, Transcript of Oral Argument (Feb. 8, 2005) at 30, *S. Fed. Power Customers v. Caldera*, 301 F. Supp. 2d 26 (D.D.C.

2004)), fails to explain why a twenty year term would not cause the same "serious impact."

In other circumstances it is conceivable that the difference between a minor and a major operational change might be an ambiguous matter of degree, where the Court would consider whether an agency's authoritative interpretation should be accorded deference under *Chevron* step two in defining the term "major operational change," *cf.* Concurring Op. at 4-5. But the Agreement's reallocation of over twenty-two percent (22%) of Lake Lanier's storage space does not present that situation. It is large enough to unambiguously constitute the type of major operational change for which section 301(d) of the WSA, 43 U.S.C. 390b(d), requires prior Congressional approval. This conclusion is reinforced by the Corps' prior consideration of reallocation proposals, *see* PAC REPORT at 12; Army Legal Memorandum at 8-12. The same conclusion applies to a reallocation of approximately nine percent (9%) of Lake Lanier's storage space, for it too presents no ambiguity. This is illustrated by the Corps' acknowledgment of the reallocation's unprecedented scale, Oral Arg. Tape (Nov. 16, 2007) at 45:16.5. Vaguely committing to request Congressional approval of the reallocation at some future date, s*ee, e.g.*, Agreement at 11; Oral Arg. Tape (Nov. 16, 2007) at 47:00.0, does not accord with the plain text of the WSA.

The Corps may understandably be of the view that it faces a "difficult situation," Oral Arg. Tape (Nov. 16, 2007) at 51:38.8, and is attempting to balance multiple interests and achieve a "creative solution," *id.* at 52:04.2. However, Congress envisioned that changed circumstances or "difficult situations" might arise and specified that any solution involving "major operational . . . changes" required its prior authorization. WSA § 301(d), 43 U.S.C. § 390b(d). We therefore need not reach the other contentions of Alabama and Florida. The Agreement's

reallocation of Lake Lanier's storage capacity to local consumption is a major operational change that under section 301(d) of the WSA, 43 U.S.C. § 390b(d), may not occur without Congress' prior authorization. Accordingly, because no authorization has been obtained, we hold that the district court erred in approving the Agreement and reverse.

SILBERMAN, *Senior Circuit Judge*, concurring in the judgment:

I agree with the majority's conclusion that, notwithstanding our limited scope of review of a district court's approval of a settlement agreement, we are obliged to reject this one. I write separately to discuss issues appellants raise which I think should be disposed of – and should be rejected so as not to complicate any further possible litigation – and to disagree with my colleagues on one important point.

Appellants argued that the Agreement violated the Flood Control Act ("FCA"), as well as the Water Supply Act ("WSA"). I think that alternative claim is quite weak. The relevant provision of the FCA states:

> **Sale of surplus waters for domestic and industrial uses; disposition of moneys** – The Secretary of the Army is authorized to make contracts with States, municipalities, private concerns, or individuals, at such prices and on such terms as he may deem reasonable, for domestic and industrial uses for surplus water that may be available at any reservoir under the control of the Department of the Army: *Provided*, that no contracts for such water shall adversely affect then existing lawful uses of such water. . . .

33 U.S.C. § 708. By its plain terms, this provision sets the conditions under which the Secretary may sell "surplus water." However, the Corps does not contend that the Settlement Agreement disposes of "surplus" water. The Agreement does *reallocate* a certain amount of reservoir capacity to water storage, but reallocations are governed by the Water Supply Act, not the Flood Control Act. Section 301(d) of the WSA requires Congressional approval of "[m]odifications of a reservoir project

. . . which would involve major structural or operational changes . . . ." 43 U.S.C. § 390b(d). It is abundantly clear, then, that the Water Supply Act, not the Flood Control Act, is the statute that governs the Corps' actions in this case, and I would accordingly explicitly reject the appellants' FCA claims.

Turning to the WSA, appellants argued – indeed, it was their main argument – that the Agreement was unlawful under that statute, not just because it constituted a "major operational change," but also because it was inconsistent with the project's authorized purposes. 43 U.S.C. § 390b(d). The Buford Dam was constructed to improve navigation, generate hydroelectric power, and control flooding. *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1122 (11th Cir. 2005). (For many years, the Corps has maintained that an incidental benefit of the project was to provide metropolitan Atlanta with water supply. *Id.*) One of the project's primary purposes, thus, was to provide hydroelectric power to downstream users. The Agreement, it is contended by Alabama and Florida, will reduce the amount of water released from the reservoir which will, in turn, reduce the water available for Alabama's and Florida's power requirements. Appellees responded that the Agreement's compensation mechanisms met the hydroelectric purposes of the project.

Under those mechanisms, the water supply providers will pay substantially higher rates for water storage, and the resulting revenue will be credited to hydropower customers to compensate them for the reduced water flows through the dam. The Corps, the power customers, and the water supply providers all agree that this compensation mechanism will ensure that the Agreement does not have an adverse effect on hydropower generation.

I would not reach the merits of this argument because I do not think Florida and Alabama have standing to raise it. The two states have not identified any cognizable injury attributable to this claim. They do not assert that they or their citizens will pay any more for electricity as a result of the Agreement. Indeed, the hydroelectric companies supplying Florida and Alabama customers – the members of the Southeastern Federal Power Customers – support the Agreement because the compensation mechanism does adequately offset the reduction in water supply. To be sure, Florida and Alabama do have standing – as the panel concludes – to object to the alleged "major operational change" because the decreased water supply will have environmental impacts on Florida and Alabama. However, standing must be established for each claim, *The Wilderness Society v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006), and appellants lack standing to assert that the Agreement will "seriously affect" the project purposes of the reservoir.

* * *

My fundamental disagreement with my colleagues' determination that the Agreement works a "major operational change" is with their conclusion that the appropriate baseline for measuring the impact of the Agreement's reallocation of water storage is zero. That seems to imply that the project was never intended to provide water to the city of Atlanta, which is in tension with the 11th Circuit's observation mentioned *infra*, and is an issue which the settling parties agreed was not determined by the Agreement; it is an open question that has not really been briefed.

Beginning in the 1970s, the Corps allocated a steadily increasing volume of storage space to the water supply providers. *Alabama v. U.S.A.C.E.*, 424 F.3d at 1122. It does not

appear that Alabama and Florida challenged this policy until 1990, when the Corps was seeking Congressional approval to enter into permanent water supply contracts. *Id.* at 1122-23. Thus, for over a decade, the appellants acquiesced to a policy of increasingly large withdrawals. Even after Florida and Alabama initiated litigation in 1990, the states entered into two agreements that allowed the Corps to increase water withdrawals "to satisfy reasonable increases in [] demand" while settlement negotiations were pending.[1]

By asserting that the baseline is zero, the majority implicitly suggests that for many years some amount of water stored for (and supplied to) the city of Atlanta was illegal. That is a draconian conclusion I do not think warranted by the record.

I nevertheless agree with the majority's determination that the Settlement Agreement is unlawful. To be sure, the definition of major operational change is by no means clear. Typically we would defer to an agency's interpretation of that ambiguous term, but we cannot do so here because we are not

---

[1]These agreements do contain disclaimers that they "shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used" during settlement negotiations. (It would appear that the word "used" in the agreements only refers to the water withdrawn during the settlement negotiations, and not to reservoir space that had been allocated to water storage prior to those agreements.) Moreover, the 1992 agreement states that it shall not be construed as "changing the status quo as to the Army's authorization of water withdrawals." This implies that – at the very least – Florida and Alabama did not contest the amount of storage that had been authorized by the Corps *prior* to 1992.

reviewing an agency rulemaking or adjudication, but only a settlement agreement (which does not even purport to interpret the crucial language). *See United States v. Mead Corp*, 533 U.S. 218, 230 (2001). We have given deference to agency interpretation of settlement agreements when Congress has granted the agency "an active role in approving the agreement." *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1571 (D.C. Cir. 1987). But we have also emphasized that such deference is inappropriate where – as here – "the agency itself [was] an interested party to the agreement." *Id.* In such cases, "deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract." *Id.* The government seems to have implicitly interpreted the term "major" in its brief – as not including incremental changes – but we do not defer to mere litigating positions. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988).

The Agreement appears to me to constitute a "major operational change" because it substantially increases the amount of reservoir space allocated to water supply compared to the allocation in 2002, which is all we have to conclude. The total storage capacity of Lake Lanier is 1,049,400 acre-feet. In a 2002 memorandum regarding Georgia's request for more water storage, the General Counsel of the Department of the Army stated that, "[c]urrently, municipal and industrial interests, through direct withdrawals and releases from the reservoir, utilize the equivalent of 145,460 acre-feet of storage in Lake Lanier for water supply." Thus, in 2002, approximately 13.9% of the reservoir's capacity was being used for water supply. Under the Settlement Agreement, up to 240,858 acre-feet of the reservoir would be set aside for water storage (175,000 acre-feet for Gwinnett County, 20,675 acre-feet for the City of Gainesville, and 45,183 acre-feet for the Atlanta Regional

Commission). This represents an increase of 95,398 acre-feet, which is a 65.6% increase over the 2002 level. Put another way, under the Agreement, approximately 9% more of Lake Lanier's total capacity will be set aside for water storage – in 2002, 13.9% of the total capacity was allocated to water supply, but under the Agreement that figure increased to 22.9%. Like the majority, I also find it noteworthy that the storage levels permitted by the Agreement "would be the largest acre-foot reallocation ever undertaken by the Corps without prior Congressional approval." Maj. Op. at 14.

At oral argument, counsel for the Corps acknowledged that the Settlement Agreement would increase the amount of reservoir space allocated to storage by approximately 100,000 acre-feet (or 10% of total reservoir capacity), compared to the status quo prior to the Agreement. Tr. of Oral Arg. at 43:20. Counsel then conceded that a permanent reallocation of 10% of the reservoir's capacity would constitute a "major operational change." *Id.* at 49:08. In a letter dated December 13, 2007, the Corps attempted to retract this concession, noting that it was "in error." But the logic of this concession was ineluctable. The Corps argued, however, that even if a *permanent* reallocation of 10% of the reservoir would be deemed "major," the Settlement Agreement does not require Congressional approval because it is only an *interim* measure. That is not persuasive. The requirements of the Water Supply Act apply to "major structural or operational changes" – the text of that statute draws no distinction between interim and permanent changes.

The Corps argues that the burden was on Florida and Alabama to show that the Settlement Agreement was unlawful, and that the plaintiffs-appellants failed to offer sufficient evidence to meet this burden. But as explained above, the record – including the Corps' own documents – shows that the

Agreement would allocate an additional 95,398 acre-feet of reservoir capacity to water storage, and would increase the share of the reservoir allocated to water storage from 13.9% to 22.9%. I simply do not see how we can conclude that is not a <u>major</u> change.